FILED

2005 SEP 30  AM 8: 06

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TAWANNA YOUNG | ) | CASE NO.  4:01 CV 1296 |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| MAHONING COUNTY, OHIO | ) | |
| | ) | MEMORANDUM OPINION |
| DEFENDANT | ) | AND ORDER |
| | ) | |
| | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | |
|---|---|---|
| | ) | |
| MELISSA DESAVIGNY | ) | CASE NO. 4:01 CV 1508 |
| | ) | |
| PLAINTIFF | ) | |
| v. | ) | JUDGE PETER C. ECONOMUS |
| | ) | |
| MAHONING COUNTY, OHIO | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| DEFENDANT | ) | |

This matter is before the Court upon the Defendant's Motion for Summary Judgement.

<u>See</u> (Case No. 4:01CV1296, Dkt. # 55; Case No. 4:01CV1508, Dkt. # 38)[1]

---

[1] On August 16, 2001, the Court ordered the consolidation of <u>Tawanna Young v. Mahoning County, Ohio (Mahoning County Sheriff's Department)</u>, 4: 01 CV 1296, and <u>Melissa Desavigny v. Mahoning County, Ohio (Mahoning County Sheriff's Department)</u>, 4: 01 CV 1508. <u>See</u> (Case No. 4:01 CV 1296, Dkt. # 10; Case No. 4:01 CV 1508, Dkt. # 11). All citations to the Civil Docket shall be to the docket utilized in <u>Young</u> unless otherwise indicated.

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.  The Mahoning County Sheriff, Randall Wellington ( the "Sheriff"), appointed the plaintiffs, Tawanna Young ("Young") and Melissa Desavigny ("Desavigny"), to the position of deputy sheriffs on May 25, 2000.  See (Dkt. # 56, Aff. of Theresa Sedzmak ("Sedzmak Aff.") ¶ 3, Exs. 2&3).  The plaintiffs' appointment letters provided, in pertinent part:

> This appointment is both provisional and permanent; i.e., not intermittent or part-time, etc.  As a provisional appointee, you will not become certified unless you serve provisionally for two years or otherwise pass a civil service exam.  Further you will serve a one-year probation, scheduled to end at midnight, May 30, 2001 . . . .  Your job duties will include those described in this department's policy manual under those titles of Deputy Sheriff.
>
> While on probation, you will receive formal performance appraisals on or about six months into your job as well as prior to the completion of your first year.  Likewise, you will also be the subject of informal evaluations.  Your performance may affect your successful completion of probation and could result in your removal.  You will not have the right to appeal any removal within your first year of employment either through the Collective Bargaining Agreement or to the State Personnel Board of Review (SPBR).
>
> While on probation and during your continued course of employment, it will be necessary for you to abide by the department's operating policies and procedures as well as general rules of conduct, special orders, memoranda, etc., while carrying out your sworn duty as a Peace Officer.
>
> While employed as a Deputy Sheriff, you will be required to maintain a valid Ohio driver's license, a telephone at your place of residence with the number known to the administration, firearms proficiency and level of fitness commensurate with your job description.

(Sedzmak Aff. ¶ 3, Exs. 2&3).

On May 1, 2001, Young filed an Ohio Uniform Incident Report (the "incident report") therein indicating that she utilized force against an inmate housed in the Mahoning County

Jail, Tanisha Wright ("Wright").[2]   See (Dkt. # 56, Aff. of Randall Wellington ("Wellington Aff.") ¶ 10, Ex. # 1; Dkt. # 59, Aff. of Tawanna Young ("Young Aff.") ¶ 4).   Young further filed charges against Wright for assaulting a peace officer in violation of Ohio Revised Code section 2903.13A.   See (Wellington Aff. ¶ 10, Ex. # 1).   Young described in the incident report the events giving rise to her use of force and filing of charges against Wright as follows:[3]

> On 05-01-01, I Deputy Tawanna Young was working the 1400-2200 shift, I was assigned to the Corrections Division, working the D/E Pod position.
>
> At 1604 hours I asked Inmate Tanisha Wright P.I.D. # 24234 to not sit in the chair by the phone if she was not using the phone so that other inmates could use the phone. Inmate Wright refused to move, so I then told her to move. I then told Wright one more time to move, or she would have to go to lock-down in her cell. Inmate Wright still refused to move. I then directed Wright to go into her cell. I then placed all of the inmates into lock-down to deal with Inmate Wright. I then called Deputy Desavigny to assist me.
>
> At 1606 hours, Deputy Desavigny arrived in D/E Pod to assist me in placing Inmate Wright into her cell. Myself and Deputy Desavigny escorted inmate Wright into her cell (D-28) without any incident until inmate Wright walked into her cell. Inmate Wright became combative then yelled "Fuck you Bitch" and then grabbed me by my throat, I quickly grabbed her arm and pushed Wright backwards. Inmate Wright then threw two punches at my face, which left a scratch on my face, on the left cheek. I then grabbed Inmate Wright's hair and kicked her in the left leg for a distraction. Myself and Deputy Desavigny then took Inmate Wright to the ground to handcuff her. I then

---

[2]Chapter 5120:1-8-03B(9) requires the filing of an incident report upon the use of force in a jail. Likewise, Mahoning County Sheriff's Office Directive #1.3 requires all deputies to report instances of use of force. See (Wellington Aff. ¶ 10, Ex. # 4; Dkt. # 59, Aff. of Diane Gonda ("Gonda Aff.") ¶ 3, Ex. # 1). Upon receiving a report of use of force, the directive requires the Mahoning County Sheriff's Department ("MCSD") to initiate an "investigation via the chain of command" to "determine if the force used was necessary to effect the arrest detention or mission." See (Gonda Aff. ¶3, Ex. # 1 at 1.3.6D).

[3]The Court shall quote extensively from the reports filed in this case. In light of the nature of these reports, the Court shall refrain from identifying spelling and grammatical errors.

> notified Sergeant Deluca of the Incident.   Myself and Deputy Desavigny
> escorted Inmate Wright to booking to be housed.  Inmate Wright was seen by
> Nurse Snyder for any injuries, Nurse Snyder reported that there was no injuries
> to Inmate Wright. Inmate Tanisha Wright was then charged with Assault on a
> Peace Officer, charges to be filed at Youngstown Municipal Court.

(Wellington Aff. ¶ 10, Ex. # 1.)

Mahoning County Sheriff's Department Lieutenant Howard Faison ("Faison") and Sergeant L. Sliwinski ("Sliwinski") thereafter investigated the assault on Young by interviewing inmate-witnesses. Faison's report provided, in pertinent part:

> While investigating an assault on a police officer, Sgt. Sliwinski and
> myself learned that the report as filed, was only a small portion of what
> happened.  We talked to inmate Wright, and seven other inmates of the same
> pod and learned that the incident started when inmate Wright refused an order
> to get out of a seat by the pod phone. All of the inmates concur that at some
> point Dep. Young went to the J/K pod and returned with Dep. DeSavney.
> During Dep. Young's absents, inmate Wright went to her cell and locked
> herself in.   All agree that the two officers then put on gloves and went to
> inmate Wright's cell and entered.   They state that they heard inmate Wright
> pleading for the officers to get off her. They claim that the two Deputies beat
> up inmate Wright and then cuffed her and dragged her from her cell, and then
> down the stairs.   Five of the seven inmates we spoke to stated that inmate
> Wright was thrown into a fire extinguisher head first and then dragged into a
> hall outside the pod.
>
> I became concerned when I first saw the assault report because this
> makes the third assault on Dep. Young this year.   I became more concerned
> when I learned that Dep. DeSaveny was also involved in this incident because
> I explained to that officer less than three months earlier that she has to stop
> being so confrontational with inmates.

(Wellington Aff. ¶ 10, Ex. # 5.)  Sliwinski's report indicated that the inmates had presented a letter containing their version of the events along with an approximately seven to eight inch clump of hair purportedly ripped from Wright's head during the altercation.  See (Wellington Aff. ¶ 10, Ex. # 6).

4

On May 2, 2001, Mahoning County Sheriff's Department Major Michael Budd ("Budd"), summoned Young to his office and advised her of the investigation. According to Young, Budd was "very vulgar and profane" and "demanded that [she] write a second statement involving the incident with Wright." (Young Aff. ¶ 6.) Specifically, according to Young:

> Budd insisted that I include in the second statement that I pulled Wright's hair and that I threw Wright down the steps. I did include a reference to pulling Wright's hair in the second statement but refused, despite Major Budd's repeated insistence, to state that I had thrown Wright down the stairs. Major Budd advised me at that meeting that I was being placed on administrative leave.

(Young Aff. ¶ 6.) Young's supplemental statement provided, in pertinent part:

> I'm being ordered to write this supplement by Major Michael Budd and my Garrity Writes does apply.
> . . . .
> On the way to take [Wright] to booking we were going down the steps and we almost fell. Dep. Desavigny let her arm go and I tried to keep myself and Inmate Wright from falling down the stairs. WE DIDN'T FALL but she bent over she was handcuffed from the back and hit HER HEAD ON THE FIRE EXTINGUISHER BOX kind of hard.

(Wellington Aff. ¶ 10, Ex. 7.)

Desavigny also prepared a statement that provided, in pertinent part:

> Deputy Young and I walked over to the desk to put on gloves and went up to the inmates room to inform [Wright] to pack up all of her stuff because we were there to move her to J-Pod (Discipline Pod). That is when the inmate started calling us bitches and grabbed Deputy Young by her throat and was hitting, scratching, kicking, and pushing Deputy Young. Deputy Young was trying to get the inmate off of her and I tried to handcuff her. I got one handcuffed but she was putting up such a fight I had a hard time to get the other arm cuffed. Deputy Young was trying to help me hold her down to get her other hand. Finally we got her cuffed. That is when Deputy Young got on one side and I was on the other and we started to escort the inmate to booking. On the way down the D-Pod steps we started to fall. That is when I had let go of the inmates arm so I didn't fall and the inmate hit her head on the fire extinguisher box at the bottom of the steps.

5

(Wellington Aff. ¶ 10, Ex. 8.)   Budd also summoned Desavigny and advised of the investigation.  See (Dkt. # 59, Aff. of Melissa Desavigny ("Desavigny Aff.") ¶¶ 4-5).

On May 8, 2001, the Sheriff issued letters  terminated the plaintiffs' employment, effective May 9, 2001.  (Sedzmak Aff. ¶ 3, Exs. 4&5).   The termination letters explicitly provided: "As a probationary deputy hired on May 30, 2000, you were put on notice that you would serve a one-year probation period.  Your performance as a Deputy Sheriff has been deemed unsatisfactory and I am, therefore, causing your removal."  (Sedzmak Aff. ¶ 3, Exs. 4&5.)

On May 29, 2001, Young filed an action (the "Young action") against the Defendant, Mahoning County, Ohio, Sheriff's Department, pursuant to Title 42 of the United States Code, section 1983.  See (Dkt. # 1 at 1).  On June 6, 2001, Desavigny filed a separate Section[4] 1983 action (the "Desavigny action") alleging identical facts and claims.  See (Case No. 4:01 CV 01508, Dkt. #1 at 1).  By stipulation of the parties, the Court consolidated the Young and Desavigny actions pursuant to Rule 42 of the Federal Rules of Civil Procedure. See (Dkt. # 10).

Following a Case Management Conference ("CMC"), the Court issued an order granting the parties sixty days in which to conduct limited discovery "on the issue of whether a constitutional right ha[d] been violated in this case."  (Case No. 4:01 CV 01508, Dkt. # 10). Additionally, the Court indicated that "[t]he Defendant ha[d] raised the defense of qualified

---

[4]All references to the term "Section," shall be to that of Title 42 of the United States Code, unless otherwise noted.

immunity in their [sic] answer.   Insofar as there are no individual defendants, qualified immunity [was] not a proper defense." (Case No. 4:01 CV 01508, Dkt. # 10).

The Defendant thereafter filed a motion for summary judgment.   In light of the arguments presented in the motion, the plaintiffs sought leave to amend their complaints for the purposes of dismissing the due process claims.   See (Dkt. # 16).   The plaintiffs vigorously argued, however, in support of their equal protection claims.   See (Dkt. # 13; Dkt. # 16).

On January 25, 2002, this Court issued an order granting summary judgment to the Defendant and denying the plaintiffs' request for leave to amend their complaint.   See (Dkt. # 20).   The Court specifically determined that the plaintiffs had presented prima facie cases of "class of one" equal protection violations.   See (Dkt. # 20 at 9) (citing Village of Willowbrook v. Olech, 528 U.S. 562 (2000)).   However, the Court concluded that the plaintiffs had failed to demonstrate that the Sheriff's actions violated any "clearly established" constitutional rights.  (Dkt. # 20 at 10); cf. Saucier v. Katz, 533 U.S. 194, 200-01 (2001); Anderson v. Creighton, 483 U.S. 635 (1987); Cope v. Heltsey, 128 F.3d 452 (6th Cir. 1997).

The Court, sua sponte, reconsidered its conclusion.   See (Dkt. # 22).   The Court determined that the ambiguity present in the plaintiffs' complaints, as well as the subsequent motions, presented confusion as to whether the plaintiffs had sought relief from the Sheriff in an individual capacity -- as the Court had determined -- or from Mahoning County.   See (Dkt. # 22 at 2).   Consequently, the Court vacated its order granting summary judgment and

7

ordered the plaintiffs to show cause as to why the claims should not be dismissed.  See (Dkt. # 22).

In response to the Court's order, the plaintiffs asserted that their complaints sought relief solely from Mahoning County, see (Dkt. # 23); thereby rendering inapplicable the Court's qualified immunity analysis.  The Defendant responded that the plaintiffs nevertheless had failed to establish the elements of a Section 1983 claim asserted against a municipality and moved for dismissal.  See (Dkt. # 26).

The Court held a status conference on March 14, 2002 where it acknowledged that the plaintiffs were pursuing municipal liability claims against Mahoning County arising from the Sheriff's actions.  The Court enquired, however, as to whether the Sheriff was an agent of the county or state of Ohio.  Accordingly, the Court ordered the parties to brief the potential Eleventh Amendment immunity of the Mahoning County Sheriff.  See (Dkt. # 31).[5]

Actually, the Court recognized that the Eleventh Amendment was not directly applicable.  The precise issue before the Court was "whether the Sheriff acted in his capacity as a state or county official when he terminated the plaintiff from Deputy Sheriff positions as the Mahoning county jail."  (Dkt. # 36 at 12.)  If the response to this inquiry was that the Sheriff acted as an agent of the state, Mahoning County (the only defendant named in the

_____

[5]The Court acknowledged its Memorandum Opinion and Order had been delayed for an inordinate period of time.  The delay was the result of the Court's erroneous interpretation of the settlement in Wright v. Young, 4:02 CV 1594.  Wright was a related case where an inmate advanced claims against the instant plaintiffs arising from the same conduct which led to their terminations (i.e., the scuffle with an "unruly inmate").  Wright was voluntarily dismissed on October 7. 2003 as the result of a settlement.  See (Wright v. Young, 4:02 CV 1594, Dkt. # 24, Dkt. # 25).  As the Court deemed this a "global settlement," it erroneously believed that the instant cases were to be dismissed as well.  Subsequent investigation revealed that these cases remained unresolved.

Complaint) could not be held liable (and the Eleventh Amendment would bar a suit against the Sheriff were he a defendant). If the response to the query was that the Sheriff was acting as an agent of the county, it followed that Mahoning County could be held liable under the "final policy maker" theory of municipal liability.

The Court analyzed Ohio law and determined that the characterization of the Sheriff turned on the precise duty at issue. As the case *sub judice* addressed the Sheriff's role in making employment decisions, it appeared likely that he was acting as an agent of the county. However, the unique role of the Sheriff in managing the county jail – Ohio law explicitly characterizes the Sheriff as an agent of the State in regard to the operation of the jail – possibly rendered him as an agent of Ohio. The Court concluded "that [] Ohio's county sheriffs serve as agents of the state of Ohio when keeping the jail and persons operating therein safely, attending to the jail, and governing and regulating the jail according to the minimum standards for jails in Ohio promulgated by the Department of Rehabilitation and Correction." (Dkt. # 36 at 21.) The Court further concluded that "an issue of fact exists as to whether the Sheriff terminated the plaintiffs' employment in the exercise of these duties." (Dkt. # 36 at 26.) Specifically, the Court noted that:

> [t]he record lacks . . . any discussions as to the circumstances giving rise to the termination, or a description of the policies allegedly not followed by the plaintiffs. Of greatest significance, the record lacks any indication whether the policies purportedly not followed were designed, developed, and administered by the Sheriff in order to comply with the minimum standards promulgated by the Department of Rehabilitation and Correction. As a result, it would be an exercise in speculation to apply the foregoing legal principles to [an] undeveloped factual record.

9

(Dkt. # 36 at 26.) The Court therefore scheduled a status conference and granted the plaintiffs leave to amend their complaints for the purposes of curing several factual deficiencies.

The plaintiffs filed their second amended complaints on May 10, 2004. See (Dkt. # 40). The second amended complaints did not alter the underlying equal protection claims; however, the plaintiffs provided further factual information regarding the incident with Wright:

> On or about May 1, 2001 Young was assigned to duty at the Mahoning County Jail. During her shift that day Young confronted inmate Tanisha Wright ("Wright") in Wright's cell. Without provocation from Young inmate Wright swore at Young, then grabbed Young by the throat. Young responded to inmate Wright's physical assault by grabbing Wright's arm and pushing Wright backward away from Young. Inmate Wright then swung at Young twice. One of the punches thrown by inmate Wright struck Young in the face. Young then kicked inmate Wright in the leg. Young's fellow deputy, Melissa Desavigny ("Desavigny"), who was also on duty at that time at the Mahoning County Jail, was present when the altercation between Young and inmate Wright occurred. Young had requested Desavigny's assistance in dealing with a verbal confrontation between Young and inmate Wright immediately before Young entered inmate Wright's cell. Young and Desavigny wrestled inmate Wright to the cell floor then handcuffed inmate Wright. Once inmate Wright had been subdued Young notified Sergeant DeLuca of the incident.

(Dkt. # 40 ¶ 5.)

The instant motion ensued.

## II.    STANDARD OF REVIEW

Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (c). "Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering such a motion, the court must review all of the evidence in the record. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

"A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323 (quoting FED. R. CIV. P. 56 (c)). The movant meets this burden "by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Clayton v. Meijer, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (quoting Celotex, 477 U.S. at 324-25). The non-movant then "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

11

"The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250). "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 250.

## III.    LAW AND ANALYSIS

### A.    Municipal Liability Claims Brought Pursuant to Section 1983

*An Overview of Municipal Liability*

Section 1983 provides a cause of action against every person who, under color of state law, subjects or causes to be subjected, an individual to the deprivation of any rights, privileges, or immunities secured by the United States Constitution or federal law. See Civil Rights Act of 1871, REV. STAT. § 1979, 42 U.S.C. § 1983.  Political subdivisions of a state (such as Mahoning County) are "persons" within the scope of Section 1983. See Monell v. N.Y. City Dept. of Social Services, 436 U.S. 658, 690 (1978); Holloway v. Brush, 220 F.3d 767, 772 (6th Cir. 2000).  This follows from the underlying purpose of the statute, which protects individual rights by punishing the infringement of those rights in order to compel a change in policy by those in position to effectuate such a change. See Monell, 436 U.S. at 686-89; Pembaur v. City of Cincinnati, 475 U.S. 469, 490 (1986) (Stevens, J., concurring in part and concurring in judgment).

Section 1983 limits municipal liability to the violation of some "official policy" attributable to the municipality, which may originate from acknowledged government lawmakers or those in positions of

12

responsibility "whose edicts may fairly be said to represent official policy." [6] <u>Monell</u>, 436 U.S. at 694. A plaintiff attempting to establish municipal liability pursuant to Section 1983 may demonstrate three categories of "official policy": (1) an express policy or custom of the municipality; (2) a final policymaker's conduct; or (3) the municipality's failure to train employees. <u>See</u> <u>Board of County Comm'rs of Bryan County, OK v. Brown</u>, 520 U.S. 397, 397-398 (1997).

The first indicia of municipal liability, an express policy or custom, is the most easily defined and identified.

> Local government bodies . . . can be sued directly under § 1983 . . . where . . . the action . . . implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such custom has not received formal approval through the body's official decision making channels.

<u>Monell</u>, 436 U.S. at 690. Thus, the municipality's policy need only be established, not formally adopted.

The second indicia of municipal liability is that of "final policymakers," who are identified through an analysis of the authority granted or asserted. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." <u>Id</u>. at 694. The plaintiff "must identify those officials

---

[6] This is meant to distinguish municipal liability from individual or vicarious liability. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a *respondent superior* theory." <u>Monell</u>, 436 U.S. at 691 (emphasis in original). "[A] local government *may not be sued* under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under §1983." <u>Id</u>. at 694 (emphasis added).

or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." Jett v. Dallas Ind. School Dist., 491 U.S. 701, 737 (1989). See also Holloway, 220 F.3d at 773. Even a single decision or action by a municipal employee may trigger municipal liability under Section 1983, so long as the decision or action is that of an authorized, final policymaker. See Pembaur, 475 U.S. at 480; Holloway, 220 F.3d at 773.

The third indicia, "employee training," is the most attenuated form of municipal liability because it is illogical that a municipality would have a policy of inadequately training its employees. The Supreme Court has explained this form of liability:

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

City of Canton, Ohio v. Harris, 489 U.S. 378, 390 (1989).

*The Sheriff as a Final Policymaker for the County*

The instant plaintiffs pursue the second indicia of municipal liability; that is, they seek to attribute liability to Mahoning County as a result of the Sheriff's conduct as an authorized, final policymaker. See (Dkt. # 16-17). The issue as to whether the Sheriff has the authority to make municipal policy turns on state law. See Waters v. City of Morristown, 242 F.3d 353, 362 (6th Cir. 2001) (citations omitted). This includes "state and local positive law,"

14

such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom. Jett, 491 U.S. at 737.

**B.     Class of One Equal Protection Claims**

The threshold issue for the Court when addressing a Section 1983 claims is whether the defendant violated a constitutional right.   This hold true irrespective of whether claim seeks to impose individual, supervisory, or municipal liability.   See   Sallier v. Brooks, 343 F.3d  868, 878 (6th Cir. 2003) (holding that a plaintiff seeking to hold an individual liable under Section 1983 must demonstrate at the outset that the facts, when viewed in the light most favorable to them, show that a constitutional violation has occurred); Comstock v. McCrary, 273 F.3d 693, 712-13 (6th Cir. 2001) (finding that a critical element of a supervisory liability claim is the existence of a constitutional infringement (or for the purposes of a motion for summary judgment, a question of fact regarding the existence of a constitutional infringement) committed by the supervisor's subordinates); Watkins v. City of Battle Creek, 273 F.3d 682 (6th Cir. 2001) (determining that municipal liability could not be imposed in the absence of a constitutional violation).

The instant plaintiffs assert that Mahoning County violated their right to equal protection of law as secured by the Fourteenth Amendment to the United States Constitution. In order to state a claim under the Equal Protection Clause of the Fourteenth Amendment pursuant to Section 1983, a plaintiff averring discrimination must ordinarily allege that a state actor intentionally discriminated against her because of her membership in a protected class. See Henry v. Metropolitan Sewer Dist., 922 F.2d 332, 341 (6th Cir.1990). "The showing that a plaintiff must make in order to recover on an employment discrimination claim under Title

15

VII mirrors that which must be made in order to recover on an equal protection claim under section 1983." Morris v. Oldham County Fiscal Court, 201 F.3d 784, 794 (6th Cir. 2000), citing Risinger v. Ohio Bureau of Workers' Compensation, 883 F.2d 475, 483-84 (6th Cir. 1989); Gutzwiller v. Fenik, 860 F.2d 1317, 1325 (6th Cir.1988). Typically, in order for a plaintiff to establish a claim of employment

discrimination, she must provide either direct evidence of discrimination or establish a prima facie case of indirect discrimination under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 810 (6th Cir.1999).

As indicated above, in order to state a claim under the Equal Protection Clause of the Fourteenth Amendment pursuant to Section 1983, a plaintiff averring discrimination must ordinarily allege that a state actor intentionally discriminated against her because of her membership in a protected class. See Henry, 922 F.2d at 341. However, the plaintiffs in the instant case are proceeding as a "class of one" under Olech. Accordingly, in order to establish a cause of action under the equal protection clause based on a "class of one," the plaintiffs must demonstrate that they are the victims of "intentional and arbitrary discrimination," i.e., "that [they have] been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564-565.

The Court acknowledges that the present cases are a few in a number filed by plaintiffs' counsel with this Court asserting "class of one"claims. The Court further acknowledges that the defendant repeatedly has asserted that "class of one" claims do not apply in the Title 42 context. Indeed, in light of recent developments in the area of these

16

claims, the undersigned questions whether the plaintiffs can proceed on their employment discrimination case under Olech.[7] For instance, Judge Posner of the United States Court of Appeals for the Seventh Circuit – a jurist that plaintiffs have identified as one "uniquely qualified to explain 'class of one' Equal Protection Case," (Dkt. # 59 at 7) – recently has observed:

> These are cases in which the plaintiff does not claim to be a member of a class that the defendant discriminates against, but argues only that he is being treated arbitrarily worse than some one or ones identically situated to him. If that is the law and any unexplained or unjustified disparity in treatment by public officials is therefore to be deemed a prima facie denial of equal protection, endless vistas of federal liability are opened.
>
> . . . .
>
> The paradigmatic "class of one" case, more sensibly conceived, is one in which a public official, with no conceivable basis for his action other than

---

[7] It is not yet clear whether the Olech decision extends beyond zoning cases and the Sixth Circuit has not definitively ruled on this issue in a published case. In unpublished cases, the Sixth Circuit has considered Olech in the context of employment discrimination. In Underfer v. University of Toledo, the Sixth Circuit denied a university professor's argument that he was a "class of one" under Olech rather than a member of a protected class for purposes of going forward with a claim under 42 U.S.C. § 1981, holding that "[w]hile the (Olech) Court affirmed the existence of a 'class of one' under an egregious set of circumstances in the equal protection context, we do not read the (Olech) decision to alter the text or legislative aims of the relevant sections of Title 42." 36 Fed. Appx. 831 (6th Cir. June 5, 2002), unpublished. But in Bower v. Village of Mount Sterling, 44 Fed. Appx. 670 (6th Cir. July 26, 2002), unpublished, the Sixth Circuit reversed the granting of summary judgment in favor of an employer on a 42 U.S.C. § 1983 claim alleging equal protection as a "class of one" under Olech. Bower conceded that he was not a member of a suspect class and he did not possess a fundamental right in order to proceed with an Equal Protection Clause claim. However, he alleged that he had asserted a claim of selective enforcement under Olech because the village mayor denied him a full-time officer job even though he was just as qualified as similarly situated officers who were hired as full-time officers through the normal procedure of the village. The Sixth Circuit held that Olech "clearly applied" to Bower's § 1983 claim that the Village intentionally discriminated against him in violation of his Equal Protection rights as a "class of one" when he alleged that he was denied the opportunity to become a full-time police officer because the village mayor manipulated the police force's hiring process in order to punish him for his parents' political opposition against the mayor. Id.

17

spite or some other improper motive (improper because unrelated to his public duties). comes down hard on a hapless private citizen--perhaps the holder of a license from the state to operate a bar or restaurant or other business--depriving him of a valuable property right that identically situated citizens toward whom the official bears no ill will are permitted the unfettered enjoyment of. E.g., Olech, 528 U.S. at 563; Esmail v. Macrane, 53 F.3d 176, 178 (7th Cir. 1995); Cruz v. Town of Cicero, 275 F.3d 579, 582, 587-88 (7th Cir. 2001); Squaw Valley Development Co. v. Goldberg, 375 F.3d 936, 944, 947 (9th Cir. 2004).  As one moves away from the paradigmatic case, the sense of a wrong of constitutional dignity, and of a need for a federal remedy, attenuates . . . . And when the public employee does not have tenure, imposing a norm of equal treatment changes employment at will, or (what is the same thing) probationary employment, into something very close to tenured employment because it is so easy to invent a case of unequal treatment by a supervisor.  The principal effect of "class of one" suits by public employees is, as this case illustrates, to undermine discipline in public agencies.

We are therefore not surprised to have found no "class of one" cases in which a public employee has prevailed, Levenstein v. Salafsky, 414 F.3d 767 (7th Cir. 2004); Hedrich v. Board of Regents, 274 F.3d 1174 (7th Cir. 2001); Staples v. City of Milwaukee, 142 F.3d 383 (7th Cir. 1998); Orr v. City of Albuquerque, 417 F.3d 1144, 2005 U.S. App. LEXIS 15852, at *13 n. 6 (10th Cir. 2005); Neilson v. D'Angelis, 409 F.3d 100, 106 (2d Cir. 2005); Campagna v. Massachusetts Dept. of Environmental Protection, 334 F.3d 150, 156 (1st Cir. 2003), since the extreme case that kicked off the "class of one" movement more than two decades ago. That was Ciechon v. Chicago, 686 F.2d 511 (7th Cir. 1982), where a paramedic was made a scapegoat for conduct that had drawn the wrath of the local media, while her identically situated partner received no disciplinary sanction at all.

Lauth v. McCollum, No. 04-3782, 2005 U.S. App. LEXIS 20099 (7th Cir. Sept. 20, 2005).

While this Court has engaged in an extensive study of the interrelationship of "class of one" claims and Title 42, the cases *sub judice* do not present any factors compelling a detailed recitation of the fruits of this study.  Suffice it to summarize for present purposes that "[e]qual protection claims can be brought by a 'class of one,' where the plaintiff alleges that the state treated the plaintiff differently from others similarly situated and that there is no rational basis for such difference in treatment."  Warren v. City of Athens, 411 F.3d 697,

18

710 (6th Cir. 2005). The "rational basis" test means that courts will not overturn government action "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 84 (2000) (internal quotation marks and citation omitted).

The initial showing a "class of one" plaintiff must demonstrate is that she was treated differently from those similarly situated. Andreano v. City of Westlake, 136 Fed. Appx. 865 (6th Cir. June 23, 2005) (citing Silver v. Franklin Township Bd. of Zoning Appeals, 966 F.2d 1031, 1036 (6th Cir. 1992)). The plaintiffs must produce evidence that the relevant comparison employees are similarly situated in all relevant respects. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).

The plaintiffs attempt to meet their initial burden by demonstrating that they were terminated for utilizing force with inmates while other deputy sheriffs of the same rank engaged in similar conduct and remained in their positions. Specifically, the plaintiffs submit thirteen use of force reports filed by five separate deputy sheriffs during the relevant period. See (Gonda Aff. ¶ 3, Exs. # 2-14).

However, as the defendant emphasizes, all of the deputy sheriffs referenced in the use of force reports were permanent – as opposed to probationary – employees. See (Dkt. # 62, Supp. Aff. of Sheriff Randall Wellington ("Wellington Supp. Aff.") ¶¶ 4-6). While the Court acknowledges that employment status is not dispositive, the plaintiffs' claim of similarity dissolves upon a review of the use of force reports because in each instance the deputy sheriffs utilized force "to deal with aggressive, confrontational inmates who posed an

19

immediate physical threat to themselves, to other deputies, or to other inmates." (Wellington Supp. Aff. ¶ 6). It is uncontroverted that the plaintiffs were not dealing with an inmate that posed a similar threat at the time force was utilized. Moreover, Desavigny had been counseled during the past year as to her conduct with inmates and Young had been assaulted on three occasions. Consequently, no reasonable jury could conclude that the plaintiffs were similarly situated to sheriff deputies that had not been terminated.

Assuming arguendo that a genuine issue of material fact exists as to whether the plaintiffs were similarly situated to other employees, the plaintiffs have not presented any evidence raising a jury question as to Wellington's rationale for terminating their employment or demonstrating that they were subject to personal ill-will. A "class of one" plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by "negativing every conceivable basis which might support" the government action or by demonstrating that the challenged government action was motivated by animus or ill-will. Warren, 411 F.3d 711. Wellington terminated the plaintiffs' employment based on unsatisfactory performance.

> The determination of unsatisfactory performance was based upon their clear violation of the prisoner discipline regulations, their obvious poor judgment in dealing with inmate Wright, their inability to maintain control and deal effectively within [sic] inmate Wright, and the [sic] demonstrated tendency to act outside the scope of their authority and power as evidence by their dealings with inmate Wright and in other incidents.

(Wellington Supp. Aff. ¶ 16.) The plaintiffs have made no attempt to challenge the factual premises supporting their termination. The plaintiffs elect to allege that Major Budd caused them to alter their statements in order to render them "scapegoats" for the incident. Indeed,

20

the plaintiffs acknowledge that "the factor that differentiates [their] situation from the situations from other situations of the other deputies discussed above is that inmate Wright filed a complaint against the Department." (Dkt. # 59 at 14.) The plaintiffs contend that "[a] reasonable jury has an evidentiary basis for finding that [their] jobs were sacrificed in order to enhance the Sheriff's Department response to inmate Wright's complaint." (Dkt. # 59 at 15-16.)

However, the stated theory of the plaintiffs' case compels this Court to grant summary judgment in favor of Mahoning County for two additional reasons. First, the plaintiffs do not negate the stated reason for their termination. It is well-settled that rational-basis review is satisfied "so long as there is a plausible policy reason" for the decision, Nordlinger v. Hahn, 505 U.S. 1, 11 (1992), and it is "entirely irrelevant for constitutional purposes" whether the plausible reason in fact motivated the policymaker, FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993). Secondly, the parties and this Court have painstakingly analyzed Wellington's conduct in relation to enacting policy for the named defendant, Mahoning County, Ohio on the facts presented in this matter. Setting aside the statutory matter of whether Wellington was an actor of the state or county when terminating the plaintiffs, the record presently before the Court reveals that he did not engage in any impermissible conduct. Again assuming arguendo that Wellington was the county's final policymaker, it was Budd –as opposed to Wellington – that the plaintiffs allege engaged in personal animus. The plaintiffs have not demonstrated any nexus between Budd's alleged conduct and Wellington's decision to terminate their employment. Budd, as a discretionary employee whose decisions were subject to review, cannot impose liability on Mahoning County pursuant to Section

21

1983 on the facts presented in these cases. See Miller v. Calhoun County, 408 F.3d 803, 814-15 (6th Cir. 2005) (holding that mere authority to exercise discretion while performing particular functions does not make an employee an final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of the superior).

**IV.**

For the foregoing reasons, the Court hereby orders that the Defendant's Motion for Summary Judgement, see (Case No. 4:01CV1296, Dkt. # 55; Case No. 4:01CV1508, Dkt. # 38, is **GRANTED**.

**IT IS SO ORDERED.**

/s/ Peter C. Economus -September 30, 2005
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**